**IN THE UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF ARKANSAS**
**FAYETTEVILLE DIVISION**

**SERGIO SAUCEDO** **PLAINTIFF**

**V.** **CASE NO. 5:23-CV-5214**

**UNITEDHEALTHCARE INSURANCE COMPANY OF THE RIVER VALLEY** **DEFENDANT**

**OPINION AND ORDER**

Before the Court is the Report and Recommendation ("R&R") (Doc. 115) of the Honorable Christy Comstock, United States Magistrate Judge for the Western District of Arkansas, filed in this case on July 1, 2026. The Magistrate Judge recommends denying Plaintiff Sergio Saucedo's Second Motion for Judgment (Doc. 40) and dismissing the case. Mr. Saucedo filed Objections to the R&R (Doc. 117), and Defendant UnitedHealthcare Insurance Company of the River Valley ("UHC") filed a Response to the Objections (Doc. 118). The Court has now reviewed the entire case *de novo*, and for the reasons explained herein, **DECLINES TO ADOPT** the R&R, **GRANTS** the Second Motion for Judgment, and **ORDERS** UHC to approve in-network coverage for the emergency medical services given by Dr. Scott Bolding on May 4 and 6, 2020.

## I. BACKGROUND

Mr. Saucedo participates in an employer-provided health insurance plan ("Plan") administered by UHC and governed by the Employee Retirement Security Act of 1974 ("ERISA"). He brings this suit to recover insurance benefits under ERISA at 29 U.S.C. § 1132(a)(1)(B), or, in the alternative, to obtain equitable relief under § 1132(a)(3). The benefits at issue relate to medical bills incurred when Mr. Saucedo was struck by a car in

the early morning hours of Sunday, April 26, 2020. The accident left him with a broken jaw, several missing and broken teeth, and facial lacerations that required stitches.

An ambulance transported Mr. Saucedo from the scene of the accident to Mercy Hospital in Rogers, Arkansas. There, the attending physician ordered x-rays of his head and spine, administered morphine and antibiotics, and sutured his lip and chin. *See* Doc. 101, pp. 122, 131. The x-rays confirmed that Mr. Saucedo broke several bones in his mid-face and jaw, including "the midline and right aspect of the mandible," "the anterior midline and right maxilla," the "right lateral maxillary wall," and the "right lateral pterygoid plate." *Id.* at pp. 120–21. He needed oral surgery; however, since the accident took place toward the beginning of the COVID-19 pandemic, the hospital's emergency room—like so many others across the country—was both overrun with COVID patients and understaffed. Certain medical procedures that would have been performed immediately in the hospital setting were being delayed or not performed at all.

Mr. Saucedo's hospital physician set up a telephone consultation with Dr. James Ragland, an ear, nose, and throat specialist ("ENT"), since the hospital did not have any oral maxillofacial surgeons on call. *See id.* at p. 131. After Dr. Ragland reviewed the x-rays online, he called the attending physician and opined that Mr. Saucedo's jaw surgery could not be performed immediately at the hospital due to a shortage of staff and would have to be done on an outpatient basis at an oral surgeon's office. *See id.* Dr. Ragland had previously made an agreement with Ozark Oral and Maxillofacial Surgery Center ("OOMSC") to refer trauma cases to their surgeons if the hospital could not offer treatment. *Id.* At Dr. Ragland's direction, hospital staff began calling OOMSC to schedule Mr. Saucedo for jaw surgery but only reached the office's answering service. After several

hours in limbo, and with no further treatment options available, the hospital sent Mr. Saucedo home with a prescription for pain medication and instructions to follow up with OOMSC. *See id.* at p. 138. Dr. Kimberly Huggins, the attending hospital physician, noted in her discharge orders that Mr. Saucedo required surgery in the next day or two—by "Monday or Tuesday." *Id.*

By Monday, April 27, Dr. Baker from OOMSC returned the hospital's call and reported he "d[id] not have staff to come to [the] hospital to do surgery" and had shut down the practice due to the pandemic. *Id.* at p. 139. Dr. Karen Haney of Mercy Hospital made more calls and eventually found an oral maxillofacial surgeon named Dr. Scott Bolding who agreed to accept Mr. Saucedo's case. *Id.* Dr. Bolding later explained in his deposition that the State of Arkansas had granted him special permission to transform his office into an operating theater, complete with an anesthesiologist, to treat trauma patients in the pandemic. *Id.* at p. 62.

Mr. Saucedo's first visit to Dr. Bolding was May 4, 2020, eight days after the accident. During this visit, Dr. Bolding took x-rays and a CT scan, completed a full medical history and physical examination, and discussed a surgical plan with Mr. Saucedo. *See id.* at pp. 66–67. On May 6, ten days after the accident, Mr. Saucedo returned to Dr. Bolding's office for surgery. He was placed under general anesthesia, and Dr. Bolding repaired multiple facial fractures and extracted nineteen damaged teeth. *See id.* at p. 70. Dr. Bolding testified that the care he gave Mr. Saucedo on May 4 and 6 would have been performed at the hospital immediately after the accident on an emergent basis—had it not been for the pandemic. *See id.* at pp. 55–59, 62–65, 70. This is confirmed by Mr. Saucedo's emergency room doctors, who noted in his file that he needed immediate oral

surgery. *See id.* at pp. 131, 138. However, because surgery took place more than a week after the accident, UHC decided it no longer qualified as a "medical emergency" as defined by the Plan. *See* Doc. 52-5, pp. 38–39. Instead, UHC treated Dr. Bolding's services as post-emergency follow-up care by an out-of-network physician.[1] *Id.* This coverage decision left Mr. Saucedo with $33,827 in out-of-pocket costs for pre-operative services on May 4, *see* Doc. 101, pp. 238–42, and $73,068 in costs for surgery on May 6, *see id.* at pp. 249–52.

## II. DISCUSSION

In this ERISA appeal, the Court must determine whether UHC abused its discretion by refusing to classify Dr. Bolding's services on May 4 and 6 as a medical emergency. *See Beard v. Lincoln Nat'l Life Ins. Co.*, 175 F.4th 943, 947 (8th Cir. 2026). Under this legal standard, the Court must uphold UHC's decision "so long as it is based on a reasonable interpretation of the plan and is supported by substantial evidence." *Ruessler v. Boilermaker-Blacksmith Nat'l Pension Tr. Bd. of Trs.*, 64 F.4th 951, 959 (8th Cir. 2023) (cleaned up). The following factors should be considered:

> whether [the insurance company's] interpretation is consistent with the goals of the Plan, whether their interpretation renders any language of the Plan meaningless or internally inconsistent, whether their interpretation conflicts with the substantive or procedural requirements of the ERISA statute, whether they have interpreted the words at issue consistently, and whether their interpretation is contrary to the clear language of the Plan.

*Id.* (citation omitted).

[1] There is no dispute that Dr. Bolding was indeed out-of-network. At the same time, he appears to have been one of the only—if not *the only*—oral surgeon in Northwest Arkansas who was both willing and able to perform surgery on Mr. Saucedo's face and jaw.

The apparent "goal" of UHC's Plan, though not explicitly labeled as such, is to administer "the benefits set forth [in the Contract] during the Contract Period, subject to the terms and conditions of this Contract and upon payment of the Premium." (Doc. 52-5, p. 26). The Plan also promises that UHC "shall provide coverage for Hospital Services and medical services covered under this Contract in so far as practical" during a "major disaster or epidemic." *Id.* at p. 52, Article 9.6.

The facts surrounding this insurance coverage dispute took place during a "major disaster or epidemic" as contemplated by the Plan. Nevertheless, UHC's coverage decision completely ignored pandemic conditions. Furthermore, there was no dispute that Mr. Saucedo's injuries on April 26, 2020, qualified as a serious "medical emergency" requiring emergency surgery according to the Plan; but UHC coded the surgery-related bills as *non-emergent follow-up care*—simply because the pre-operative consultation and surgery took place more than a week after the accident, again, due to the pandemic. *See* UHC's Brief in Support of Judgment on the Administrative Record, Doc. 105, pp. 9–10.

The Court begins its analysis of the coverage decision by reviewing the Plan's definition of "medical emergency." Under Article 1.22, this term is defined as:

> A medical condition manifesting itself by acute symptoms of sufficient severity (including severe pain) such that a prudent layperson, who possesses an average knowledge of health and medicine, could reasonably expect the absence of immediate medical attention to result in:
>
> > 1.22.1 placing the health of the individual (or, with respect to pregnant women, the health of the woman or her unborn child) in serious jeopardy; or
> >
> > 1.22.2 serious impairment of bodily functions; or
> >
> > 1.22.3 serious dysfunction of any bodily organ or part.

*Id.* at p. 31. Importantly, UHC does not dispute that Mr. Saucedo's serious injuries *continued to meet* the Plan's definition of "medical emergency" from the date of the accident until the date Dr. Bolding performed surgery on May 6. Because oral surgery at the hospital was impossible, Mr. Saucedo was sent home in "severe pain," "serious[ly] impaired" in his ability to eat and speak normally, and suffering "serious dysfunction" of the mouth and jaw. *Id.*

Under the Plan when a "medical emergency" arises, Article 5.7 lays out coverage options. It specifies that when emergency services are needed and "[a] Physician is not immediately available, the Member should seek emergency care at the most convenient health care facility." *Id.* at p. 38. Once again, UHC does not dispute that Mr. Saucedo complied with Plan provisions: As Mercy Hospital had no on-call oral maxillofacial surgeons, Mr. Saucedo sought care—as directed by the emergency room doctor and the on-call ENT—at Dr. Bolding's office.

UHC admits that if Dr. Bolding's treatments on May 4 and 6 had qualified as a "medical emergency" requiring "emergency services," Article 3.2.1 would have mandated coverage at the "in-network" level of benefits reflected in Attachment D of the Plan even though Dr. Bolding is out-of-network. *See* Doc. 105, p. 10. Article 3.2.1 also states that when receiving "emergency services," a Plan member "is not responsible for paying any amounts or charges exceeding the 'In-Network' level of benefits." (Doc. 52-5, p. 36). UHC refused to cover Dr. Bolding's bills under Article 3.2.1 and instead coded his services as out-of-network "follow-up care" due to the time-lag between the accident and the surgery. In support of this decision, UHC relies on the text of Article 5.7.1, which states:

> If it is determined that a Medical Emergency existed, or that the visit to the Hospital or other emergency facility was medically necessary, the initial visit

> will be covered. Follow-up care received in a Hospital or an emergency facility is not covered; the Member must arrange follow-up care with a Physician.

*Id.* at p. 38. UHC interprets the above to mean: (1) covered "emergency services" can *only* be offered during the "initial visit" to the hospital; and (2) "emergency services" not immediately available at the hospital are, by default, considered "follow-up care" that is not covered. For the reasons explained below, this reading of Article 5.7.1 is unreasonable and makes other Plan provisions meaningless.

First, Article 5.7.1 states that in a medical emergency, "the initial visit will be covered"—not that *only* the initial visit will be covered. *Id.* Second, the final sentence of Article 5.7.1 *does not state* that emergency care not immediately available at the hospital is "follow-up care" not subject to coverage; instead, it says that follow-up care when administered "*in a Hospital . . . facility*" is not covered."[2] *Id.* (emphasis added). The Court finds that UHC's (wrong) interpretation of Article 5.7.1 renders meaningless Article 5.7, which provides that when emergency services are needed and "the Physician is not immediately available, the Member should seek emergency care at the most convenient health care facility." *Id.* It is beyond debate that Mr. Saucedo's untreated facial fractures and associated dental injuries still constituted a medical emergency requiring emergency services on May 4 and 6, per Article 1.22, and that Mr. Saucedo sought emergency care at the most convenient health care facility available at the time, per Article 5.7.[3]

---

[2] Clearly, the purpose of this last sentence in Article 5.7.1 is to discourage Plan participants from seeking routine follow-up care at the hospital.

[3] UHC's reliance on Article 5.7.2 to justify its coverage decision is similarly misguided. Article 5.7.2 states a "general rule" that in the event of a medical emergency, "the date of the onset of symptoms and the date of treatment as reported on the claim form should be the same but not more than 24 hours after an illness or surgery." *Id.* at p. 39. It goes

Accordingly, the Court **DECLINES TO ADOPT** the R&R (Doc. 115) and **SUSTAINS** Plaintiff's Objections (Doc. 117). UHC's refusal to classify the May 4 and 6 services by Dr. Bolding as "emergency services" given during a "medical emergency" under Article 3.2.1 was an abuse of discretion.

## III. CONCLUSION

**IT IS THEREFORE ORDERED** that Plaintiff's Second Motion for Judgment (Doc. 40) is **GRANTED** insofar as Defendant's coverage decision for services provided by Dr. Scott Bolding on May 4 and 6, 2020, is **REVERSED**, and Defendant is directed to extend coverage for these emergency medical services at the "in-network" level of benefits shown in Attachment D of the Plan in accordance with Article 3.2.1. The Court will enter judgment concurrently with this Order. If Plaintiff wishes to file a motion for fees and costs, he may do so within fourteen days of judgment.

**IT IS SO ORDERED** on this 21st day of September, 2026.

TIMOTHY L. BROOKS
CHIEF UNITED STATES DISTRICT JUDGE

without saying that a "general rule" contemplates exceptional cases, and the COVID-19 pandemic not only qualifies as an exceptional case but was actually contemplated in Article 9.6 of the Plan. *See id.* at p. 52. Under the circumstances, UHC's strict adherence to the "general rule" in Article 5.7.2 renders meaningless not only Article 9.6 but also Article 5.7, which advises Plan participants how to get covered emergency treatment when a doctor is "not immediately available." *Id.* at p. 38. UHC abused its discretion by applying the "general rule" in Mr. Saucedo's case knowing his accident met the Plan's definition of a "medical emergency" under Article 1.22. *Id.* at p. 31.